# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

No. 96-20862

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRANK C. CIHAK;
HENRY S.  LANDAN;
MERCED CANTU, JR.;
I.  STEPHEN BLOCH;
PATRICIA RUIZ,

Defendants-Appellants.

---

Appeals from the United States District Court
for the Southern District of Texas

---

March 13, 1998

Before HIGGINBOTHAM and STEWART, Circuit Judges, and WALTER,[*] District Judge.

CARL E. STEWART, Circuit Judge:

In the district court, a jury convicted defendants Frank C. Cihak, I.  Stephen Bloch and Henry Landan of conspiracy to defraud, misapply and launder funds of a federally insured financial institution (18 U.S.C. § 371), bank fraud (18 U.S.C. § 1344), nine counts of wire fraud (18 U.S.C. § 1343), ten counts of misapplication of bank funds (18 U.S.C. § 656), and six counts of domestic money laundering (18 U.S.C. § 1956(a)(1)(B)(i)).   Bloch alone was co nvicted of nine counts of international money laundering (18 U.S.C. § 1956 (a)(2)(B)(i)).  Cihak alone was convicted of five counts of making false entries in bank records (18 U.S.C. § 1005).  Landan alone was convicted of

---

[*]District Judge of the Western District of Louisiana, sitting by designation.

three counts of receiving stolen money (18 U.S.C. § 2315). Defendants Cihak, Bloch, Patricia Ruiz and Merced Cantu, Jr. were convicted of conspiracy to obstruct justice (18 U.S.C. § 371) and obstruction of justice (18 U.S.C. § 1503).[2]

Cihak was sentenced to 262 months in prison, Landan to 78 months, Bloch to 121 months, Cantu to 51 months, and Ruiz to 41 months. The district court also ordered restitution of $9,973,005 jointly and severally payable by Cihak, Bloch and Landan and imposed $50,000 fines on Ruiz and Cantu.

On appeal, Cihak argues that this prosecution violated the Double Jeopardy provision of the Fifth Amendment; that the district court abused its discretion and unduly prejudiced him by admitting evidence of his previous conviction for similar and related offenses; that his convictions on Count 1 (conspiracy to defraud, misapply and launder funds of a federally insured financial institution in violation of 18 U.S.C. § 371) must be reversed because the jury may have convicted him on a legally insufficient basis; that the district court erred in determining his offense level for sentencing purposes; and that the district court erred by ordering him to pay $9,973,005 in restitution.

Bloch and Landan make virtually identical arguments on appeal: that the district court abused its discretion and unduly prejudiced them by admitting evidence of codefendant Cihak's previous conviction for similar and related offenses; that their convictions on Count 1 (conspiracy to defraud, misapply and launder funds of a federally insured financial institution in violation of 18 U.S.C. § 371) must be reversed because the jury may have convicted them on a legally insufficient basis; that the district court erred in determining their offense level for money laundering under the sentencing guidelines. In addition, Landan argues that the district court abused its discretion by denying his motion for severance.

---

[2]The indictment in this case originally consisted of 48 counts. Cihak and Landan were acquitted on Count 30. Count 31 was dismissed on the government's motion.

Cantu argues that the district court erred in admitting extraneous act evidence against him; that the district court abused its discretion by denying his motion for severance; and that the district court erred in determining his offense level under the sentencing guidelines.

Ruiz argues that the district court abused its discretion and unduly prejudiced her by admitting evidence of codefendant Cihak's previous conviction for similar and related offenses and that the district court abused its discretion by denying her motion for severance.

All five defendants challenge the sufficiency of the evidence supporting their convictions.

After a thorough review of the record, we AFFIRM defendants' convictions and REMAND as regards the sentencing of Ruiz and Cantu.

BACKGROUND

In 1987, First City National Bank of Houston ("First City") was taken over by a group of private investors, the Abboud Group. Defendant Cihak, a Chicago banker, was a member of the Abboud Group. Cihak was made Vice Chairman of the board and the senior credit officer at First City.

Cihak hired defendant Bloch, the owner of Banner Corporation ("Banner"), a Maryland data processing consulting company, as a consultant to First City. Bloch hired subcontractors to do the actual work on the bank's projects and then charged a markup on the amount the subcontractors charged him. From November 1987 until Cihak was removed from the bank in June 1990, Bloch charged First City approximately $10.5 million in consulting fees, however, the invoices that Bloch received from the subcontractors totaled only $2,782,185.

The government contends that Cihak received approximately $2 million in kickbacks, funneled through his attorney, defendant Landan from the payments that First City made to Bloch. The government further contends that the funds were dispersed in the following manner: (1) First City paid Banner for Bloch's consulting services; (2) Bloch deposited the checks from First City into Banner's account; (3) the funds were then wired to another Banner account; (4) from this account,

3

Bloch drew checks payable to himself; (5) these checks were deposited into his personal account; (6) checks made payable to Landan were then drawn on this account; (7) these checks were deposited into Landan's firm's account; (8) from this account, Landan issued checks payable to various banks as payment on Cihak's outstanding debts and to make investments for Cihak.

The government further contends that when bank officials became suspicious of Cihak and Bloch, they, along with defendants Ruiz and Cantu fabricated a cover story to account for the kickbacks from Bloch. Under this scheme, Cihak claims to have entered into a joint venture agreement with defendant Ruiz in March of 1988. The agreement contained a "note with conversion option" under which Ruiz would loan Cihak up to $2 million. According to the government, the scheme was structured to look as though the payments that Cihak received through Landan were merely the funds that Ruiz was loaning him in connection with the joint venture. With the aid of Cantu, Cihak, Bloch and Ruiz falsified documents regarding the funds received by Cihak. These documents were eventually provided to the United States government during its investigation of the operations at First City.

DISCUSSION

I.    Double Jeopardy

In 1993, defendant Cihak and a different set of co-conspirators were convicted of defrauding First City.[3] Cihak now argues that the instant prosecution violates the Double Jeopardy Clause of the Fifth Amendment because it concerns the same conspiracy that was at issue in the 1993 case.

The question of whether this prosecution violates the Double Jeopardy Clause is one of law and is thus reviewed de novo. See United States v. Deshaw, 974 F.2d 667, 669 (5th Cir. 1992). However, we will accept the underlying factual findings of the district court unless they are found to be clearly erroneous. See id.

---

[3] This Court affirmed the 1993 convictions in United States v. Allen, 76 F.3d 1348 (5th Cir. 1996), cert. denied, 117 S.Ct. 121 (1996).

In order to determine whether a subsequent prosecution is barred by the Double Jeopardy Clause, we must first apply the test articulated by the Supreme Court in <u>Blockburger v. United States</u>, 284 U.S. 299, 304 (1932), which entails determining whether the offense charged in the subsequent prosecution "requires proof of a fact which the other does not." <u>Blockburger</u>, 284 U.S. at 304. If application of that test reveals that the offenses have identical statutory elements or that one is a lesser included offense of the other, then the inquiry must cease, and the subsequent prosecution is barred. <u>See</u> <u>Brown v. Ohio</u>, 432 U.S. 161 (1977).

In conspiracy cases, this issue is colored by the question of "whether one, or more than one, agreement existed." <u>Deshaw</u>, 974 F.2d at 673. Determining whether more than one agreement existed involves the consideration of the following five factors:

> (1) time, (2) persons acting as co-conspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offense charged which indicates the nature and scope of the activity which the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place. <u>United States v. Marable</u>, 578 F.2d 151, 154 (5th Cir. 1978).

No one factor of the <u>Marable</u> analysis is determinative; rather, all five factors must be considered in combination. <u>United States v. Atkins</u>, 834 F.2d 426, 432-33 (5th Cir. 1987), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u>, 933 F.2d 325 (5th Cir. 1991). Using this analysis, the district court found that the <u>Allen</u> case and the instant case concerned separate conspiracies. In explaining his decision, the district court judge wrote as follows:

> Although no single factor is determinative, I reach this conclusion because the only overlapping co-conspirator in the two cases is Mr. Cihak; and because the overt acts alleged in the two cases are different and because the actions of the separate conspiracies alleged in the other case did not advance the conspiracy alleged in this case and vice versa. I also note that there are some differences in the time of the conspiracies alleged, the statutory offenses alleged and the places where the conspirators operated. <u>United States v. Cihak</u>, 95 F.3d 1149, No. 95-20797 (5th Cir. Aug. 15, 1996) (unpublished) (quoting the district court's order denying Cihak's motion to dismiss Count 1 of the instant prosecution).

The district court's decision was affirmed by a panel of this Court. <u>See</u> <u>id.</u> (holding that the two prosecutions involved separate conspiracies). We agree with the district court's well-reasoned

5

application of the Marable analysis and hold that no violation of the Double Jeopardy Clause of the Fifth Amendment has occurred in this case.

II.     The District Court's Admission of Rule 404(b) Evidence

The defendants argue that the district court abused its discretion and unduly prejudiced them by admitting evidence of Cihak's 1993 conviction for similar and related offenses.  However, we will not reverse the district court's decision to admit Rule 404(b) evidence absent an abuse of discretion. United States v.  Zanabria, 74 F.3d 590, 592 (5th Cir.  1996).

We hold that the district court judge properly instructed the jury as to the limited purpose of the evidence in question and its limited applicability, or where appropriate, lack of applicability to each defendant.[4]

III.    Severance

Defendants Landan, Cantu and Ruiz argue that once the evidence of Cihak's prior convictions was admitted, the district court should have granted their motions for severance.  We review the

---

[4]The district court judge gave the following limiting instructions to the jury regarding the evidence of Cihak's previous conviction:

During this trial, you have heard evidence of acts of the defendant Cihak which may be similar to those charged in the indictment but which were committed on other occasions. You must not consider any of this evidence in deciding if any of the defendants, including Frank C.  Cihak, committed the acts charge in the indictment.  However, you may consider this evidence for other very limited purposes.

If you find beyond a reasonable doubt from other evidence in this case that Frank C. Cihak did commit the acts charged in the indictment, then you may consider evidence of the similar acts allegedly committed on other occasions to determine whether Frank C.  Cihak had the state of mind or intent necessary to commit the crime charged in the indictment.

You may also consider this evidence of similar acts to determine whether the Defendant I.  Stephen Bloch had motive to commit certain of the acts charged in counts 38 through 46 of the indictment, but for no other reason.

These are the limited purposes for which any evidence of other similar acts may be considered.  You may not consider this evidence against any other defendant.

6

denial of a motion for severance for an abuse of discretion. United States v. Bermea, 30 F.3d 1539, 1572 (5th Cir. 1994). There was no abuse of discretion.

Under Rule 8(b) of the Federal Rules of Criminal Procedure joinder of defendants is permissible "if they are alleged to have participated in the same . . . series of acts or transactions constituting an offense or offenses." United States v. Coppola, 788 F.2d 303, 306 (5th Cir. 1986). Further, "[d]efendants who are indicted together, should generally be tried together, particularly in conspiracy cases." United States v. Musquiz, 45 F.3d 927, 931 (5th Cir. 1995). We have previously held that "[i]f defendants have been properly joined, the district court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable determination of guilt or innocence." Bermea, 30 F.3d at 1572. Thus, we have opined that "the mere presence of a spillover effect does not ordinarily warrant a severance." United States v. Sparks, 2 F.3d 574, 583 (5th Cir. 1993), cert. denied, 510 U.S. 1080 (1994).

We have reviewed the record and perceive no evidentiary basis for Landan, Cantu's, or Ruiz's conclusion that damaging evidence presented against Cihak prevented the jury from making a reliable determination of their guilt. As we have noted above, the district court properly limited the application of the Rule 404(b) evidence. A jury is presumed to be able to follow an instruction regarding separating the evidence according to its admissibility against each defendant at a joint trial. See United States v. Rocha, 916 F.2d 219, 229 (5th Cir. 1990). Thus, given the limiting instruction given by the district court, we are confident that the jury was able to give separate, individual consideration to the charges against each defendant.

IV.    Sufficiency of the Evidence

    A.    Standard of Review

Each defendant argues that the evidence supporting his or her conviction was insufficient.

However, "[i]t is by now well settled that a defendant seeking reversal on the basis of insufficient evidence swims upstream." United States v. Mulderig, 120 F.3d 534, 546 (1997), petition for cert. filed, 66 USLW 3364 (Nov. 12, 1997) (No. 97-805). "We must affirm a judgment of conviction if a reasonable jury could conclude that the government proved each element of the crime charged beyond a reasonable doubt." Id. (citing United States v. Mmahat, 106 F.3d 89, 97 (5th Cir. 1997), cert. denied, 118 S.Ct. 136 (1997)). We view the evidence in the light most favorable to the verdict and give favor to all reasonable inferences in favor of the jury's verdict. Id.

      B.      The Cihak/Bloch/Landan Conspiracy

      1.      Bank Fraud and Misapplication of Funds of a Federally Insured Financial Institution

There is no dispute that Bloch drafted numerous checks which were made payable to Landan for Cihak's benefit and that those funds were traceable to First City.[5] To establish a conspiracy violation under 18 U.S.C. § 371, the government must prove beyond a reasonable doubt: "(1) an agreement between two or more people, (2) to commit a crime against the United States, and (3) an overt act by one of the conspirators to further the objectives of the conspiracy." United States v. Dupre, 117 F.3d 810, 820 (5th Cir. 1997) (citation omitted), cert. denied. 118 S.Ct. 857 (1998).

      a.      Cihak and Bloch

Cihak and Bloch, along with codefendant Ruiz, claim that the flow of funds were in connection with a joint venture agreement entered into by Bloch and Ruiz on March 2, 1988 in order that Ruiz might acquire Cihak's stock in Golden State Broadcasting, a company owning radio stations in Tucson, Arizona. The defendants testified that, under the agreement, the checks that Bloch wrote to Cihak obligated him to repay Ruiz at ten percent annual interest. However, neither Cihak, Bloch nor Ruiz was able to produce any documentation regarding the negotiation process

---

[5]Defendants argue that the funds in question, though traceable to First City, ultimately belonged to First City's holding company. Because the holding company was not a federally insured financial institution, defendants contend that 18 U.S.C. § 371 cannot apply to the alleged conspiracy. We will address the issue of whether the funds in question were in fact those of a federally insured institution at a later point in this opinion.

8

leading up to the formation of the agreement, nor any documents produced subsequent to the signing of the agreement. Further, the only copy of the joint venture agreement that was produced by the defendants was one that was faxed to Ruiz by codefendant Cantu in 1994.

There was also a question as to the date that the agreement was signed. For instance, Bloch testified that he and Ruiz signed the joint venture agreement in Tucson on March 2, 1988. However, the government entered into evidence receipts signed by Bloch from a hotel in Texas that indicated that he was staying at that hotel from March 1 to March 4, 1988.

Ruiz, who supposedly signed the agreement, was remarkably ignorant of the structure of the agreement and the amount of funds that had supposedly been transferred to her. At one point, she even told FBI agent Tracy Clark that the agreement was between Bloch and Cihak rather than between her and Bloch.

The jury also had before them evidence that suggested that the substance of the agreement was fabricated at a later date by the defendants. For example, the purported agreement gave Ruiz an option to obtain up to 78 percent of the Golden State Broadcasting stock. However, at the time that the agreement was supposedly signed, Cihak only owned 46.5 percent of the stock. He did not obtain the additional stock until five months after the date that the agreement was said to have been signed.

Finally, there are no records of this transaction with any of the relevant regulatory agencies. No sale of any interest in the radio stations was recorded with the FCC nor did Cihak ever report the sale of his stock in his financial reports to First City.

The evidence indicates that a jury could have reasonably concluded that the agreement, if any, between Bloch and Ruiz was a fabrication designed to cover up for the kickbacks that Cihak was receiving from Bloch. We, therefore, find that there was sufficient evidence to support the jury's finding that Cihak and Bloch conspired to defraud First City.

> b.      Landan

9

Defendant Landan does not dispute that the funds in question were given to him by Bloch and that he used these funds, under Cihak's direction, for Cihak's benefit. However, Landan claims that he had no knowledge that the funds that he received from Bloch had been illegally obtained. In order for Landan to be deemed to be a member of the Cihak/Bloch conspiracy, it must be established that he had knowledge that the funds were illegal. However, a member of a conspiracy does not need to be aware of every detail of the conspiracy. Rather, a knowledge of the "conspiracy's general purpose and scope" is sufficient. United States v. Harbin, 601 F.2d 773, 781 (5th Cir. 1979). Further, if the jury concluded that Landan remained deliberately ignorant of the source of the funds, then this deliberate ignorance is sufficient to establish that he knowingly participated in the conspiracy. See United States v. Cavin, 39 F.3d 1299, 1310 (5th Cir. 1994).

Richard Topps, a Trust Officer of the Worth Bank and Trust, testified that in 1987, he communicated with Landan through written correspondence and by phone about establishing a gift trust account. The account that they discussed was structured in the following manner: Bloch was the grantor, Cihak the beneficiary, and Landan the trustee. The account was initially funded with $1,000 and Topps understood that the account would eventually contain $2 million. In his correspondence with Landan, Topps informed him that records and reports concerning the account would have to be filed annually with the Internal Revenue Service ("IRS").

Despite the initial $1000 contribution, no other funds were deposited in the trust account. Rather, the funds that Landan received from Bloch were deposited into a special account held by Landan's law firm. This account would not have to submit forms that would include Cihak's name to the IRS. During the three years that Landan received checks from Bloch, deposited them into his firm's account, and used them for Cihak's benefit, he never discussed the funds with members of his firm even when he became aware of the investigation of Cihak and Bloch. Moreover, during the entire time that he received these funds, he refrained from using the firm's accounting department to process the funds. Finally, when Cihak, amid allegations of wrongdoing, resigned from First City, Landan closed the special account.

10

This evidence, though circumstantial, is sufficient for a reasonable jury to infer that Landan was either aware of the illegal source of the funds or that he deliberately remained ignorant of that illegal source. See United States v. Duncan, 919 F.2d 981, 991 (5th Cir. 1990) ("inferences drawn from relevant and competent circumstantial evidence" are sufficient to uphold a conspiracy conviction). In either case, the evidence is sufficient to support a conclusion that Landan acted in concert with Cihak and Bloch and was thus, a member of the conspiracy. See United States v. Dupre, 117 F.3d at 820 ("evidence of cooperative effort is sufficient to support . . . convictions for conspiracy to commit bank fraud").

c.      Sufficiency of the Evidence that Defendants Defrauded a Federally Insured Financial Institution

Cihak, Bloch, and Landan claim that their convictions under 18 U.S.C. § 371 must be reversed because they were convicted on a legally insufficient basis. To this end, they argue that the government did not prove that they intended to defraud First City, a federally insured financial institution. Rather, they claim that the money involved in the transactions in which they participated belonged to First City Bancorporation, First City's holding company which was not federally insured.[6]

All of the payments made to Bloch's company, Banner Corporation, were written on a First City account. Funds for that account were supplied by First City Bancorporation. The account was reconciled by the holding company on a monthly basis. However, the fact that the holding company reimbursed First City for the funds dispersed to Bloch does not erase the fact that First City had temporary control of the funds. It is settled law that when a bank even temporarily loses possession, control, and use of its funds, then the misapplication and bank fraud statutes (18 U.S.C. §§ 656 and 1344, respectively) have been satisfied. See Allen, 76 F.3d at 1358 (misapplication and bank fraud); United States v. Cauble, 706 F.2d 1322, 1354 (5th Cir. 1983) (misapplication); United States v. Frydenlund, 990 F.2d 822, 824 (5th Cir. 1993) (bank fraud).

_____

[6]We rejected a similar argument in Cihak's previous bank fraud case. See Allen, 76 F.3d. at 1357-1359.

11

Accordingly, we find that, given that there was sufficient evidence to support the jury's finding that Cihak, Bloch, and Landan conspired to violate 18 U.S.C. §§ 371 and 1344 and in light of the fact that First City was at least temporarily deprived of its funds, the jury did not rely on legally insufficient evidence in concluding that the defendants were guilty of conspiracy to commit bank fraud or conspiracy to misapply bank funds.

### 2. Money Laundering

Cihak, Bloch and Landan argue that the government failed to prove beyond a reasonable doubt that they laundered the consultant's fees obtained through bank fraud and misapplication of bank funds. In addition, Bloch argues that insufficient evidence exists to support the jury's finding that he is guilty of international money laundering.

In order to obtain a conviction for either domestic or international money laundering, the government must prove, among other things, that the funds in question were the proceeds of the specified unlawful activity. See United States v. West, 22 F.3d 586 (5th Cir. 1994); United States v. Alford, 999 F.2d 818, 823 (5th Cir. 1993). Bank fraud and misapplication offenses are complete once the funds leave the control of the bank. See Allen, 76 F.3d at 1361; Frydenlund, 990 F.2d at 824; Cauble, 706 F.2d at 1354. Thus, the funds became "proceeds" of bank fraud and misapplication at the moment that they left First City's control and were deposited into Banner's account. See Dupre, 117 F.3d at 821; Allen, 76 F.3d. at 1361; Cauble, 706 F.2d 1354.

Given that the jury had before it sufficient evidence to convict Cihak, Landan, and Bloch of bank fraud and misapplication of funds and that it did so convict, and given the undisputed fact that First City's funds were paid to Bloch and, through Landan, eventually were returned to Cihak, the defendants' conviction of domestic money laundering is also supported by sufficient evidence. Likewise, we hold that the jury's finding that Bloch laundered money internationally was supported by sufficient evidence.

Shortly after Cihak's 1993 conviction, Bloch began to transfer approximately $860,000 of his assets from accounts in the United States to accounts in Mexico and Panama. Approximately

12

$450,000 of this was in a retirement fund which Bloch's financial advisor Thomas Welsh told him would charge him approximately $45,000 in fees unless he could wait another six months to liquidate. Nonetheless, Bloch, over his advisor's objections, liquidated the accounts. Per Bloch's instructions, the money was transferred from his IRA and other accounts to accounts in two Texas banks. From Texas, the money was transferred to the Mexican and Panamanian accounts.

It has already been established that the funds in question were, under the statute, "proceeds" of an unlawful activity. In addition to this showing, in order to obtain a conviction for international money laundering under 18 U.S.C. § 1956(2)(B)(i), the government must prove that the defendant intended to conceal the nature, location, source, ownership, or control of the proceeds of the unlawful activity. United States v. Dobbs, 63 F.3d 391, 397-98 (5th Cir. 1995). Bloch argues that the government failed to prove the requisite intention to conceal and that it was unreasonable for the jury to convict him on this count. We disagree. The evidence that the timing of the transfers was coincident with Cihak's conviction coupled with that showing Bloch's apparent hurry to liquidate his accounts and transfer them out of the country, was sufficient to support the jury's conclusion that Bloch transferred the money in order to conceal its source and location.

### 3. Obstruction of Justice

Defendants argue that there was insufficient evidence for a reasonable jury to convict them of obstruction of justice and conspiracy to obstruct justice. Obstruction of justice involves any attempt to impede the due administration of justice. Because the jury convicted defendants Cihak and Bloch of conspiring to defraud First City, the jury necessarily rejected the joint venture story concocted by the defendants as a legitimate reason for the flow of funds from First City back to Cihak. Consequently, the substantive count of obstruction of justice has been proved.

There is substantial evidence that Cihak, Bloch, Ruiz and Cantu worked in concert to impede the bank fraud investigation of Cihak and Bloch. For instance, shortly after visiting Cihak in prison, Cantu traveled to Arizona to recover Golden State Broadcasting records regarding Cihak's stock ownership. During the same period of time, Cantu faxed the joint venture agreement to Ruiz. (As

noted above, this faxed copy was the only copy of the joint venture agreement that defendants were able to produce.) Further, when investigators searched Cantu's home office, they found notes that referred to getting rid of "anything on Barry Witz," the person from whom Cihak eventually acquired his majority share in Golden State Broadcasting.

There is also evidence that the defendants acted in concert to acquire Golden State Broadcasting after fabricating the joint venture agreement. For instance, during the month following Cantu's visit to Cihak, Ruiz purchased Golden State Broadcasting's license. She used $36,000 given to her by Bloch to do so.

Cantu also received substantial amounts of money from Bloch. Between June 1993 and January 1995, Cantu received amounts in excess of $180,000. These funds include a $68,270 loan from Texas National Bank which was guaranteed by Bloch and used to save Cantu's home from foreclosure.

In order for the government to prove obstruction of justice and conspiracy to obstruct justice, there must have existed a pending judicial proceeding at the time that defendants acted. See United States v. Aguilar, 515 U.S. 593, 599 (1995); United States v. Neal, 951 F.2d 630, 632 (5th Cir. 1992). Cihak, Bloch, Cantu and Ruiz argue that there is insufficient evidence to support the jury's conclusion that there was a pending judicial proceeding ongoing while they were involved in the coverup. We disagree.

The grand jury began issuing subpoenas in this case in August 1994. Cantu visited Cihak and faxed the joint venture agreement to Ruiz in September of 1994. Further, in March 1995, through counsel, Bloch provided the purported joint venture documents to the government. Finally, during a May 1995 interview, Ruiz told the FBI information that was aimed at substantiating the joint venture story. Although, at first blush, Cantu may seem peripheral to the conspiracy, there was sufficient evidence to support the jury's conclusion that he possessed the requisite knowledge to be considered a member of the conspiracy. The evidence shows that the computer equipment in Cantu's home office was purchased well after the computer file containing the joint venture agreement was

14

created. Thus, it is unlikely that Cantu drafted the joint venture agreement that he eventually faxed to Ruiz. However, Cantu's argument that his visit to Cihak in prison and his trip to Arizona occurred well before the grand jury issued indictments in this case is of no moment. The visit, the trip, and the faxing all occurred after the grand jury issued a subpoena thus beginning their investigation. From this evidence, it was reasonable for the jury to conclude that Cantu acted along with the other defendants in furtherance of the conspiracy despite knowledge of a pending investigation.

V.      Sentencing

All five defendants contend that they were assigned inappropriate offense levels under the Sentencing Guidelines. They argue that the district court improperly used the total amount of funds transferred from First City to Banner as the basis for the specific offense characteristic under § 2S1.1(b)(2) of the Sentencing Guidelines.[7] We review factual findings in sentencing determinations for clear error while a district court's application of the Sentencing Guidelines is reviewed de novo. See Dupre, 117 F.3d at 825 (citation omitted).

Under § 2S1.1, the "value of the funds" involved in money laundering includes all the proceeds of the specific unlawful activity. See Allen, 76 F.3d at 1369; United States v. Leahy, 82 F.3d 624, 638 (5th Cir. 1996). We have already established above that all of the funds became "proceeds" of the criminal activity once they left First City's control. Thus, the district court was correct in using the total amount of funds paid to Banner in calculating the defendants' offense levels.

Section 2J1.2(c), the guideline for conspiracy to obstruct justice, requires that Ruiz's and Cantu's sentences be calculated under § 2X3.1. Under § 2X3.1, a defendant's base offense level is calculated to be six levels lower than the offense level for the underlying offense. Application Note 1 indicates that in determining the offense level for the underlying offense, the court should "[a]pply the base offense level plus any applicable specific offense characteristics that were known, or reasonably should have been known, by the defendant."

---

[7]Cihak made the same argument unsuccessfully before this Court in Allen.

Both defendants Ruiz and Cantu's offense levels were determined to be 22, which was six levels lower than the offense level of 28 assigned to Cihak and Bloch's money laundering convictions under § 2S1.1. Ruiz and Cantu argue that this determination was erroneous because they did not reasonably foresee that they were obstructing the investigation of money laundering involving over $7 million. The limitation on "reasonable foreseeability" applies only to the "specific offense characteristic," not the base offense level. See Section 2X3.1, Appl. N. 1.; Section 1B1.3, Appl. N. 10; United States v. Girardi, 62 F.3d 943, 945-46 (7th Cir. 1995). However, as the government acknowledges, the district court made no finding of reasonable foreseeability and, therefore, we remand for further determination of this issue regarding Ruiz and Cantu.

VI.     Restitution

Defendants Cihak, Landan and Bloch argue that the district court erred in using the amount of the consulting fees that Bloch collected from First City as the basis for restitution. Rather, appellants argue that the district court should have subtracted the value that First City received from Bloch's services from the amount that Bloch collected.

The district court's determination of the amount in restitution owed First City is one of fact. Thus, it is reviewed for clear error.[8] This factual determination includes ascertaining the value of Bloch's services. It is conceivable that these services could have been worth as little as nothing and as much as was actually collected by Bloch. However, because of defendants' fraud, it is not possible to determine which portion of the fees paid to Banner were for actual value received by First City. Thus, the district court's use of the total amount of the consulting fees was not clearly erroneous. See United States v. Seligsohn, 981 F.2d 1418, 1421 (3rd Cir. 1992) (upholding award for total

_____

[8]Landan objected below to the use of the full amount of the consulting fees in determining the amount of restitution to be paid. Thus, Landan's claim is reviewed for clear error. Bloch and Cihak, on the other hand, did not object below, therefore their claims are reviewed for plain error. However, because the clear error standard is easier to satisfy than that of plain error, a finding that no clear error existed will also show that there was no plain error committed by the district court.

16

amount of fraudulent claims where defendant's fraud prevented victim from distinguishing between legitimate and illegitimate claims), cited with approval, <u>United States v. Turner</u>, 107 F.3d 1120, 1136 (5th Cir. 1997), <u>cert.</u> <u>denied</u>, 118 S.Ct. 390 (1997).

## CONCLUSION

We find neither legal error nor that the evidence supporting defendants' convictions was insufficient. We, therefore, AFFIRM in part and REMAND for determination of the issue of foreseeability as it applies to Ruiz and Cantu's offense levels under the Sentencing Guidelines.