United States Court of Appeals
Fifth Circuit

**F I L E D**

February 2, 2007

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
For the Fifth Circuit

No. 05-10065

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

HUMBERTO FIDEL REGALADO CUELLAR,

Defendant-Appellant.

Appeal from the United States District Court
For the Northern District of Texas

Before JONES, Chief Judge, KING, JOLLY, HIGGINBOTHAM, DAVIS, SMITH, WIENER, BARKSDALE, GARZA, DeMOSS, BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO and OWEN, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

We took this case *en banc* to consider whether the government presented sufficient evidence at Cuellar's trial to support his conviction of international money laundering under 18 U.S.C. § 1956(a)(2)(B)(i). For the reasons that follow, we conclude that the evidence was sufficient to prove all elements of the offense. We also consider Cuellar's arguments that the district court erred in admitting the expert testimony of Agent Nuckles, which

arguments were unnecessary for the panel to address under its disposition of the case. Finding no error, we affirm.

## I.

On July 14, 2004, defendant Humberto Fidel Regalado Cuellar was stopped just south of Eldorado, Texas, about 114 miles from the Mexican border. Cuellar was traveling south in a Volkswagon Beetle toward Mexico on State Highway 77. Highway 77 runs toward Del Rio, Texas, which is directly across the border from Acuna, Mexico. He was pulled over by Deputy Kevin Herbert from the Schleicher County Sheriff's office, after Herbert observed the vehicle traveling very slowly, approximately 40 miles per hour in a 70 mile per hour zone. The car also swerved onto the shoulder, leading Herbert to suspect that the driver might be intoxicated. Because Cuellar spoke no English, Herbert called State Trooper Danny Nunez to assist him. As they waited for Nunez to arrive, Herbert attempted to determine whether Cuellar had insurance. Cuellar handed him written material from the glove compartment. He then exited the car, without being asked, and went to the front of the VW where the trunk was located and lifted the lid. Such behavior raises suspicion among law enforcement officers because it is considered a diversionary tactic used to draw attention away from other locations in the vehicle where contraband is hidden.

2

In the papers Cuellar handed Herbert were bus tickets issued in Cuellar's name. The tickets showed northbound travel the previous day, from Del Rio, Texas to San Antonio. They also showed a departure the same day from San Antonio to Big Spring, Texas. From there the tickets showed a departure to Lubbock, with a stop in Tulia, ending in Amarillo and then reversing course. Also among the papers were three Mexican permits to operate a vehicle without license plates. Two were in Cuellar's name, dated April 17, 2004 and June 28, 2004. The third, dated May 18, 2004, was in the name of David Rodriguez Aleman. The papers also included a traffic ticket issued to Cuellar in Mexico on March 5, 2004.

Nunez arrived and began to talk to Cuellar. Nunez became suspicious of Cuellar because he was avoiding eye contact and seemed very nervous. Cuellar claimed he was on a three-day business trip attempting to buy vehicles, despite the fact that he had no luggage or extra clothing. Cuellar gave conflicting stories about his travels, saying first that he was coming from Acuna, Mexico and later that he had been in San Angelo and was on his way to Acuna. Nunez noticed a bulge in Cuellar's pocket, and when asked about it, Cuellar pulled out a wad of cash that smelled like marijuana to the officers. Nunez then requested that a drug search dog come to the scene.

3

While waiting for the canine unit, Nunez asked Cuellar for permission to search the vehicle. Cuellar consented. The officers started with the trunk that Cuellar had opened. Nunez noticed drill marks on the fender walls and evidence of tampering on the gas tank. Contraband is often transported in gas tanks and in secret compartments behind fender walls. Nunez considered the markings as evidence of possible modifications to facilitate transportation of contraband. He also noticed that mud appeared to be splashed purposefully on the car with an acoustic gun, which is done by criminals to cover up tool marks, fresh paint and other work done on a vehicle. In addition, while most of the car's interior was faded and worn, the carpet appeared newer. Animal hair was found in the vehicle, concentrated in the rear area, but nowhere else in the car. Cuellar claimed that he had used the VW to transport goats on a prior occasion. Nunez doubted that goats could fit in the space.

Nunez also found a Whataburger bag with a receipt dated earlier the day of the stop. After calling the phone number on the receipt the officers determined that the restaurant was in Big Spring, which is northwest of San Angelo - farther north than Cuellar told officers he had traveled. A border patrol agent called to the scene checked Cuellar's last border crossing date. That information was also inconsistent with Cuellar's story.

4

While Nunez was talking to Cuellar and searching the car, Nunez observed Cuellar standing on the side of the road and making the sign of the cross leading Nunez to believe that Cuellar knew he was in trouble.

Deputy Chatham arrived with the canine unit. The dog alerted on the money in Cuellar's pocket and on the back floorboard area of the car. The officers found a hidden compartment underneath the floorboard containing $83,000 wrapped in duct tape bundles inside blue Walmart sacks and marked with a Sharpie as to the amounts in each bundle. A Sharpie was in the glove box of the car along with a Phillips-head screwdriver that matched the types of screws used in the hidden compartment. Chatham noticed that animal hair was concentrated in the area of the compartment. He testified that animal hair is often used to try to distract a dog during a search but it does not work.

The officers arrested Cuellar and transported the car to the sheriff's office for further investigation. At the station Cuellar wanted to call his family in Mexico and told Nunez that if he did not have the car in Mexico by midnight "his family would be floating down the river."[1] As Cuellar was questioned, he gave several different versions of his travels, including the

_____

[1] When Cuellar made this statement he did not know the officers had discovered the cash in the hidden compartment.

5

purpose of his trip, where he had been and when, and who owned the vehicle he was driving.

At trial, the government also offered testimony from Special Agent Richard Nuckles of U.S. Immigration and Customs, an expert on drug trafficking organizations. Nuckles testified that drug operations typically involve the flow of drugs from Mexico into the United States and the flow of cash proceeds of drug sales from the United States back into Mexico. He described the usual methods employed by drug traffickers in transporting drugs and money across the border. Cash is usually bundled. Duct tape and plastic are used to cover the odor of drugs and to prevent couriers from pilfering bills from the stash. Vehicles used to transport drugs and cash are sometimes registered in the driver's name to avoid suspicion in the event of a traffic stop. Nuckles also indicated that couriers of drug proceeds would almost certainly know they were involved in illegal activity and were carrying money. Nuckles' description of the typical drug courier was consistent with the facts concerning Cuellar. Nuckles did not testify regarding what customarily happens to the drug money in Mexico other than to say that it is returned to those in charge of the drug trafficking operation. Once in Mexico, which has a more cash-based economy than the U.S., the dollar can be used as readily as the peso.

Cuellar testified at his trial that he was in the business of buying and selling vehicles. He had purchased the Volkswagon Beetle in March and used it in his business. He also testified that he had carried small goats in the car. Cuellar said that he sold the car in May to a Mr. Morcia. Morcia could not get a permit for the car, so Cuellar obtained the permit in his own name in June 2004. Cuellar crossed the car into the United States and delivered it to Mr. Morcia and returned to Mexico.

Cuellar stated that he began a bus trip on July 13, 2004, to Amarillo, Texas to buy two trucks. He was only planning to be gone for two days so he carried no luggage. He arrived in Amarillo on July 14th, where a friend was waiting with the trucks. They began driving toward Acuna, using one truck to tow the other. The two men stopped in Big Spring, but found no additional trucks at an acceptable price. When they arrived in San Angelo, Cuellar called Mr. Morcia to inquire about trucks for sale. Mr. Morcia showed them a truck and suggested that Cuellar buy the truck and tow the Volkswagon back to Mexico. The VW had a transmission problem that Cuellar was going to repair in Mexico, where needed parts were available. Cuellar did not want to buy the truck Mr. Morcia had shown him but offered to buy a truck he had seen in Big Spring if Mr. Morcia would loan him the necessary funds. Cuellar stated that Mr. Morcia lent him $1,600

7

to buy the other truck, which was part of the money he was carrying in his pocket.

According to Cuellar, Mr. Morcia told him to deliver the Beetle to a certain shop in Acuna, run by Mr. Morcia's brother-in-law. Cuellar drove the Beetle and his friend took the two trucks. Cuellar was unable to purchase the truck in Big Spring because the price was too high. After looking at other cars, Cuellar bought lunch at the Whataburger and then headed to Acuna. On the way to Acuna, the Beetle broke down and Cuellar could only drive it 18 miles per hour. Cuellar stopped in Eldorado to look at another vehicle but didn't see the price. He was then stopped by the officers just outside of Eldorado. Cuellar said that he opened the hood of the car after being asked to do so. He denied knowing about the money and making the comment about his family floating down the river.

After all the evidence was presented, Cuellar moved for a judgment of acquittal alleging that the government had failed to prove all the elements of the offense, which was denied. The jury found him guilty. After trial, Cuellar filed a motion for judgment of acquittal, alleging that the government failed to prove the required elements of the offense. The district court denied the motion and sentenced Cuellar. Cuellar appeals.

8

A divided panel of this court concluded that the government's evidence was insufficient to support Cuellar's conviction on the issue of whether Cuellar's transportation of the funds hidden in the VW was designed to conceal or disguise the nature, location, source, ownership or control of the proceeds and whether Cuellar knew that. We took this case *en banc* to reconsider that question. We also address the evidentiary issue raised by Cuellar relating to admissibility of the expert testimony of Agent Nuckles which the panel did not reach.

## II.

Cuellar argues that the district court erred in denying his motion for judgment of acquittal because the facts outlined above are insufficient to sustain Cuellar's conviction under 18 U.S.C. § 1956(a)(2). The denial of a motion for judgment of acquittal is reviewed *de novo*. United States v. Delgado, 256 F.3d 264, 273 (5th Cir. 2001). The verdict will be affirmed if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt. *Id*. In assessing the sufficiency of the evidence, this court does not evaluate the weight of the evidence or the credibility of the witnesses but views the evidence in the light most favorable to

the verdict, drawing all reasonable inferences to support the verdict. *Id*. at 273-74.

Cuellar was convicted of international money laundering in violation of 18 U.S.C. § 1956(a)(2). Section 1956 outlaws two types of money laundering. Subsection (a)(1) prohibits a person from knowingly engaging in a financial transaction involving illicit criminal proceeds knowing that the transaction is designed to conceal or disguise the nature, location, source, ownership or control of the illicit proceeds.[2] Subsection (a)(2), the subsection Cuellar's prosecution is brought under, does not require a transaction. Instead it prohibits a person from transporting (or attempting to transport) illicit funds, from a place inside the United States to a place outside the United States, knowing that such transportation is designed to conceal or disguise the nature, location, source, ownership or

---

[2] That subsection reads as follows:
(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
. . .
(B) knowing that the transaction is designed in whole or in part –

    (i) to conceal or disguise the nature, the location , the source, the ownership, or the control of the proceeds of specified unlawful activity . . .
shall be sentenced . . .

10

control of those proceeds.[3]  Because both subsections of the statute contain identical language to describe the concealment element of the crimes, courts rely on cases under either subsection as controlling on the issue of concealment.  United States v. Bieganowski, 313 F.3d 264, 279 (5th Cir. 2002).

The plain language of the statute of conviction, 18 U.S.C. § 1956(a)(2)(B)(i), which outlaws international money laundering, requires the government to prove five distinct elements. First, it must show that the transportation or attempted transportation of funds was across U.S. borders. Second, the funds in question must be the proceeds of specified unlawful activity.[4] Third, the

---

[3]  That subsection reads as follows:
 (a)(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States to or through a place outside the United States
. . .
(B) knowing that the monetary instrument or funds involved in the transportation represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part --
(i)  to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . .
shall be sentenced . . .

[4]    In contrast, the money smuggling statute, 31 U.S.C. § 5332, outlaws the unreported transportation of large sums of money outside the country whether they are legitimate funds or illicit funds.   In passing that legislation, Congress found that transporting money across the border may be the most common form of

11

accused must know that the funds represent such proceeds. Fourth, the transportation of the funds must have been designed (in whole or in part) to conceal or disguise the nature, location, source, ownership or control of the proceeds. Fifth, the accused must know that such concealment was part of the transportation plan or design.

The panel unanimously found that the government's proof was sufficient to establish the first three elements. On the first element (the international element), the government offered sufficient evidence that Cuellar was attempting to transport money into Mexico. He told the officers he was headed for Acuna and so testified at trial. Although he claimed he did not know the money was in the car, the jury was free to disbelieve this testimony, especially given the evidence of his guilty knowledge discussed in Section III.

On the second and third elements, the evidence was sufficient to allow a reasonable jury to infer that the money was proceeds of drug trafficking and that Cuellar knew that. The evidence of Cuellar's guilty knowledge discussed in Section III was also probative on these elements. In addition, the money smelled of marijuana and was bundled in a way that is typical of

---

money laundering. 31 U.S.C. § 5332, Congressional Findings and Purpose.

12

drug trafficking. The jury was able to infer from the expert testimony regarding drug trafficking operations that Cuellar's conduct was consistent with that of a typical drug money courier who knows what he is carrying. Based on this evidence, a reasonable trier of fact could have concluded that the money hidden in the car was proceeds of drug trafficking and that Cuellar knew that.

The issue narrows to the fourth and fifth elements, whether the government produced sufficient evidence to allow the jury to find that the defendant was knowingly transporting the funds under a plan designed at least in part "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds." 18 U.S.C. § 1956(a)(2)(B)(i). Cuellar argues that if all the government's proof shows is that the money was hidden to allow it to be transported to Mexico, that is not enough to sustain a conviction. He reads the statutory prohibition against transportation that is designed in part to conceal the nature, location, source, ownership or control of the proceeds as requiring proof of a plan to conceal the funds once they reach the ultimate destination outside the country.[5] The plain words of the statute do not support this interpretation.

_____

[5] The dissent makes a similar argument by asserting that the statute does not prohibit "concealing something to transport it," but only prohibits "transporting something to conceal it."

13

The transportation of the funds to the border begins when they leave the owner's hands and are delivered to the courier. The transportation ends when the funds arrive at the destination. Cuellar's transportation plan or design includes the trip to Mexico as well as the disposition of the funds once they reach Mexico. So concealment of the funds during the U.S. leg of the trip is a vital part of the transportation design or plan to get the funds out of this country.

On several bases, we find that the government adequately established the concealment prong of the statute, i.e. that Cuellar's transportation of the funds was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership or control of the proceeds. First, the evidence establishes that the transportation was designed to conceal the nature of the proceeds. The concealed cash, like the cash found on Cuellar's person, had a strong enough odor of marijuana that the drug sniffing dog alerted on both. The smell identified it as proceeds associated with illicit drug activity. Several measures were taken in an effort to contain the odor of the drug tainted funds and conceal the nature of the hidden funds as drug proceeds during the transportation. The duct tape wrapped cash bundles were first covered in plastic bags and then covered by carpet. Goat hair was placed in the area of the concealed cash

14

in an attempt to conceal the odor from a drug sniffing dog. In addition, because the packaging of the cash in duct tape and markings on the packages are consistent with methods used by drug traffickers without regard to the odor, placing the packaged cash in a hidden compartment also helped conceal the association of the money with an illegal enterprise. The jury could conclude that these aspects of the transportation were designed to conceal or disguise the nature of the cash as drug proceeds.

The evidence also supports a conclusion that the transportation was designed to conceal the location of the cash. Part of the transportation plan outlined above clearly was designed to contain the odor of the cash and hide the cash in a secret compartment during transport.

The government's proof also establishes that the transportation was designed to conceal or disguise the source, ownership or control of the cash. Cuellar had very little information about the person, identified by Cuellar as Mr. Morcia, who was the owner of the cash. The transportation plan allowed the owner to put the cash in the hands of an intermediary or third party, which made it difficult for authorities to determine who actually owned or controlled the cash. Agent Nuckles testified that drug dealers typically insulate themselves

15

from others in the organization, such as couriers, to avoid revealing their identity.

Cuellar argues that a conviction under § 1956, which deals with money laundering, requires proof that the defendant's acts created the appearance of legitimate wealth or converted dirty money into clean. The Second Circuit in United States v. Ness, 466 F.3d 79 (2d Cir. 2006), expressly rejected this argument and the panel's position on this issue. In Ness, the defendant received narcotics proceeds and remitted them to others connected with the same drug operation. Concealment was established by the use of "clandestine meetings to transfer large sums of concealed cash, the use of coded language, and the scrupulous avoidance of a paper trail." Id. at 81. On this evidence, the Second Circuit found that "a jury could find that the acts of which Ness is accused were designed, at least in part, to conceal the identity of the funds." Id. We agree. Although creating the appearance of legitimate wealth is one way of concealing illicit funds, it is not the only way concealment can be established.[6] This

_____

[6] The phrase "create the appearance of legitimate wealth" appears to have first appeared in a statement of purpose of money laundering by the Department of the Treasury. As quoted in United States v. Garcia-Emanuel, 14 F.3d 1469, 1474 (10th Cir. 1994), the purpose is "concealing the illicit sources of their monies by creating the appearance of legitimate wealth." Garcia-Emanuel quotes a similar description by the President's Commission on Organized Crime. The commission "described money laundering as schemes designed to assist criminals who 'seek to change large

16

argument is inconsistent with the statutory language and with our case law. Congress chose the broad, unqualified word "conceal." It makes no sense to say that Congress only intended to prohibit concealment that is accomplished in a certain way.

Two cases from this circuit hold that simply taking steps to hide illicit funds is sufficient to prove concealment. In <u>United States v. Short</u>, 181 F.3d 620 (5th Cir. 1999), the defendant gave $25,000 in cash to his wife with instructions to put it in a safety deposit box in a relative's name. The defendant's conviction of money laundering was sustained even though nothing happened to the cash except the defendant removed it from his possession and tried to hide it. In <u>United States v. Cihak</u>, 137 F.3d 252 (5th Cir. 1998), the defendant Bloch hurriedly transferred funds from his bank in the U.S. to banks out of the country after his co-conspirator was convicted of bank fraud. Concealment was found based on the timing of the transfers coincident with his co-defendant's conviction and the defendant's apparent hurry to liquidate his accounts and transfer them out of the country. The funds were not converted into other assets and were placed in accounts under the defendant's name.

---

amounts of cash . . . into ostensibly legitimate form, such a business profits or loans, before using those funds for personal benefit . . .'" <u>Id.</u>

17

Cases in other circuits with facts more closely on point with this case support a conclusion that concealment was established in this case. In United States v. Carr, 25 F.3d 1194 (3d Cir. 1994), the defendant's conviction for international money laundering was affirmed on evidence that Carr transported cash in a carry-on bag for a flight to Colombia. When asked at the airport to declare any monetary instruments in excess of $10,000, he declared that he had only $4,000 in cash. A search revealed $180,000 in cash hidden in a container in the bag and an additional $6,000 on his person. Carr told a highly suspicious, "if not incredible" story about the source and destination of the funds.[7]

Cuellar argues that the 10th Circuit opinion in United States v. Dimeck, 24 F. 3d 1239 (10th Cir. 1994), supports his argument that proof of concealment requires evidence that the defendant attempted to convert dirty money into clean money and

---

[7] See also United States v. Hurtado, 38 F. App'x. 661 (2d Cir. 2002). Hurtado with others was stopped crossing the border into Canada. A search of her van revealed several pieces of luggage containing $540,000. Drug dogs alerted to two of the bags. Customs agents testified regarding methods used by drug cartels to use couriers to exchange large quantities of drugs for cash, the packing of the money (which matched the packaging in the van), and that cash was commonly placed in bags that had previously held the drugs explaining why the drug dogs would alert on bags containing cash. Hurtado lied about her employment and had no legitimate explanation for the source of the cash or its destination. Her conviction for international money laundering under § 1956(a)(2) was affirmed.

18

that mere transportation of illegal funds from place to place is not the type of activity the statute is intended to target. Dimeck's role in the drug transaction was to collect funds in Detroit that were due to the supplier and deliver the funds to the courier who in turn brought the funds to the supplier in California. Dimeck delivered the funds to the courier in an unsealed, untaped box, marked with the logo of Dimeck's company. Dimeck suggested that the courier move the cash to another container, but the courier did not do so.

The 10th Circuit found that the evidence did not support a conviction because "delivery of the money did not result in the kind of transaction prohibited by 18 U.S.C. § 1956(a)(1)(B)(i)." Id. at 1246. The funds were transferred to the supplier in a box marked with Dimeck's company logo and were not transported in a manner designed to confuse or mislead anyone about the characteristics of the proceeds. The court also seemed to conclude that the underlying crime was not complete and the government failed to establish that funds were proceeds of illegal activity. The court observed that "The money laundering statute was designed to punish drug dealers who thereafter take the additional step of attempting to legitimize their proceeds so that observers think their money is derived from legal enterprises." Id. at 1247.

19

Dimeck is distinguishable from today's case on several bases. We read the primary holding of Dimeck to rest on the conclusion that the funds were not yet proceeds of a specified illegal activity, because the illegal activity, the drug sale, was not complete until the funds were delivered.[8] In addition, the facts of Dimeck do not display the effort to hide or conceal the "nature, the location, the source, the ownership, or the control" of the funds that the government established in Cuellar's case. The participants in Dimeck simply transported the "illegal proceeds as illegal proceeds" with a minimal attempt at concealment. Id. at 1246.

In contrast, the record in today's case reflects a number of facts a recent 11th Circuit opinion considered relevant in establishing the concealment prong of the money laundering statute. United States v. Johnson, 440 F.3d 1286 (11th Cir. 2006), contains a thorough review of the types of activities that satisfy the concealment element under 18 U.S.C. § 1956(a)(1) and (a)(2). From a review of the caselaw, the following were listed as evidence to consider in determining whether a transaction or transportation is designed to conceal:

---

[8] We question the conclusion that the funds making up the payment are not themselves proceeds of illegal activity because they presumably were generated by sales of the drugs to end users or other distributors.

20

> Statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal funds in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves culminating in the transaction; or expert testimony on practices of criminals.

Id. at 1291. Another consideration the court found probative is whether the money is "better concealed or concealable after the transaction than before." Id. After looking at the facts of several transactional money laundering cases, the court stated that they had in common "either numerous transfers, multiple accounts, or the use of third parties to effectuate concealment of the actual source of the money." Id. at 1293.

Several of the activities listed above are present in this case. Cuellar made unbelievable and inconsistent explanations for his activities indicating an intent to conceal. The way the money was hidden within the vehicle demonstrates unusual secrecy surrounding the transportation of the funds. Expert testimony was presented about the practices of criminals transporting illegal proceeds to Mexico consistent with Cuellar's transportation. In addition, Cuellar was a third party transporter used to effectuate concealment of the actual source and ownership of the money. Finally, given Mexico's largely cash

21

economy, if Cuellar had successfully transported the funds to Mexico without detection, the jury was entitled to find that the funds would have been better concealed or concealable after the transportation than before.

Under the facts as presented by the government, the evidence was more than sufficient to support Cuellar's conviction of money laundering under 18 U.S.C. § 1956(a)(2).

### III.

Cuellar's remaining issue on appeal relates to the expert testimony of Special Agent Nuckles. Cuellar argues that the district court erred in allowing Nuckles to testify because the government failed to provide the defense with the disclosure required by Federal Rule of Criminal Procedure 16. Cuellar also contends that parts of Nuckles' testimony constitute impermissible drug courier profiling and should have been excluded on that basis.

Shortly after Cuellar was arraigned, he filed a motion under Fed. R. Crim. P. 16(a)(1)(G) requesting a summary of the government's opinion testimony. The district court granted the motion. A little over two weeks before trial, the government informed Cuellar of the government's intent to introduce expert testimony from Richard Nuckles, an Immigration and Customs Enforcement Agent. The letter stated that his testimony would

22

concern background information regarding drug smuggling operations and methods used to transport drugs and money into and out of the United States. Fed. R. Crim P. 16(a)(1)(G) requires the government to provide upon request a written summary of expert testimony that the government intends to use in its case in chief, including "the witness's opinions, the bases and reasons for those opinions, and the witness's qualification." The government's disclosure did not fully comply with the rule. Cuellar argues that the district court reversibly erred by denying his motion to exclude Nuckles' testimony.

This court reviews a district court's rulings on discovery violations for abuse of discretion. United States v. Doucette, 979 F.2d 1042, 1044-45 (5th Cir. 1992). A violation of Rule 16 does not necessitate exclusion of the testimony. Rule 16 (d)(2) states that the court "may," but is not required, to impose sanctions. If the district court elects to admit the evidence without sanctions, a new trial must be ordered based on alleged discovery error only when a defendant demonstrates prejudice to his substantial rights. Doucette at 1044-45. See also

23

Fed.R.Crim.P. 52(a).[9] Cuellar raises two sources of prejudice, surprise and the admission of drug profile testimony.

The type of expert testimony offered by Officer Nuckles has become almost routine in drug cases where interpretation of the defendant's actions or other evidence would be helpful to the jury. United States v. Ortega, 150 F.3d 937, 943 (8th Cir. 1998). In this circuit, "the rule is well-established that an experienced narcotics agent may testify about the significance of certain conduct or methods of operation unique to the drug distribution business, as such testimony often is helpful in assisting the trier of fact understand the evidence." United States v. Washington, 44 F.3d 1271, 1283 (5th Cir. 1995). Such opinions, unlike technical or scientific expert opinions, are not complex, so less extensive disclosure may adequately advise the defense of the nature of the testimony and allow them to prepare for cross-examination. United States v. Jackson, 51 F.3d 646, 651 (7th Cir. 1995).

---

[9] The Doucette test provides the proper standard of review for deciding whether the error claimed by Cuellar requires reversal of his conviction. See also Fed.R.Crim.P. 52(a). The dissent is correct that the test laid out in United States v. Sarcinelli, 667 F.2d 5, 6-7 (5th Cir. Unit B 1982), provides the district court with the framework for evaluating whether to impose a sanction for a Rule 16 violation and for this court to evaluate the propriety of the sanction imposed. See also United States v. Katz, 178 F.3d 368, 371 (5th Cir. 1999), and United States v. Bentley, 875 F.2d 1114, 1118 (5th Cir. 1989). Reversal requires a showing that the refusal to impose a sanction prejudiced the defendant.

24

Although Cuellar has demonstrated a violation of Rule 16(a)(1)(G) because the government's disclosure regarding Nuckles' testimony was incomplete, he has not shown that the violation prejudiced his substantial rights. The principal violation of Rule 16 arises from the failure to provide Nuckles' qualifications and the basis for his testimony on a timely basis. Cuellar does not claim prejudice related to the information that was lacking in the notice the government did provide or argue that it would have provided additional grounds for cross-examination. The disclosure, while lacking in detail, did reveal in general terms the nature of Agent Nuckles' testimony. The record of counsel's cross examination of Nuckles shows likely familiarity with testimony of this nature which is frequently used by the government in the prosecution of cases of this nature. See United States v. Washington, 44 F.3d at 1283, n.45 and cases cited therein. Cuellar did not directly attack Nuckles' testimony about the manner in which drug smuggling operations are conducted. However, he did effectively cross-examine Nuckles and elicited testimony that tended to undermine the government's point that Cuellar was transporting the proceeds of a drug transaction. Nuckles conceded on cross-examination that a variety of illicit and legal enterprises could have a need to transport United States currency to Mexico and also testified

25

that United States currency can be useful in obtaining permits and other items of value needed to do business in Mexico.

The purpose of Rule 16(a)(1)(G) is "to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim P. 16 Advisory Committee Notes to 1993 amendment. Although the notice provided by the government did not contain all the detail required by the rule, it did notify Cuellar of the fact that the government intended to call Agent Nuckles as an expert witness and the subject of his expected testimony. The purposes of Rule 16 were not frustrated. Cuellar has not shown that the violation of the discovery order by the government necessitated the exclusion of Nuckles' testimony, the "most extreme sanction possible." United States v. Bentley, 875 F.2d 1114, 1118-19 (5th Cir. 1989). Neither has he demonstrated that his substantial rights were prejudiced by any surprise resulting from the discovery violation. Doucette, 979 F.2d at 1044-45; United States v. Smith, 354 F.3d 390, 397 (5th Cir. 2003).

Cuellar also argues the district court erred in allowing Nuckles to provide drug courier profile testimony. Cuellar

26

specifically references the following testimony, which occurred during the government's direct examination of Nuckles:

> Q:    Does a drug smuggler give his marijuana or his money to be transported to someone who doesn't know what they are transporting?
>
> A:    Not in my experience.  The people who are driving money or who are driving dope know that they are transporting either dope or money, something of value.  They may not know that - - whether they are marijuana or cocaine.  They may not know how much money they have, but they know they are transporting it.

Although Cuellar objected to the admission of Nuckles' testimony generally as a violation of Rule 16, Cuellar did not object to the above testimony as improper drug-courier profile testimony.

An appellant must raise an objection to the admission of evidence at trial such that the issue is presented to the district court with sufficient specificity.   Rule 103(a)(1) F.R.E.;  United States v. Maldonado, 42 F.3d 906, 910 (5th Cir. 1995).   Cuellar's failure to raise the issue at trial results in plain error review.  Id. at 912.  Under that standard, we do not correct an error raised for the first time on appeal unless there is (1) error, (2) that is plain, and (3) that affects substantial rights.  United States v. Olano, 507 U.S. 725, 731-37 (1993).  If these factors are established, the decision to correct the forfeited error is within the court's sound discretion, which will not be exercised unless the error seriously affects the

27

fairness, integrity, or public reputation of judicial proceedings. Id. at 736.

We have previously disapproved of the use of an expert's drug courier profile evidence as a substitute for substantive evidence of a defendant's guilt and we repeat that disapproval today. A drug-courier profile is "nothing more than a compilation of characteristics which aid law enforcement officials in identifying persons who might be trafficking in illegal narcotics." United States v. Williams, 957 F.2d 1238, 1242 (5th Cir. 1992). Drug-courier profiles "have long been recognized as inherently prejudicial because of the potential they have for including innocent citizens as profiled drug couriers" and therefore are not admissible as substantive evidence of the defendant's guilt. Id. (internal quotation marks omitted.).

In United States v. Gutierrez-Farias, 294 F.3d 657 (5th Cir. 2002), this court held that it was error to admit expert testimony that "crosses the borderline . . . between a mere explanation of the expert's analysis of the facts and a forbidden opinion on the ultimate legal issue in the case. The clear suggestion of [the agent's] testimony is that, because most drivers know there are drugs in their vehicles, Gutierrez must have known too." Id. At 663 (internal quotations and citations

28

omitted). Similarly in United States v. Ramirez-Velasquez, 322 F.3d 868 (5th Cir. 2003), where the agent testified that drug organizations seek trustworthy drivers because their cargo is valuable and uninsurable, this court determined that the admission of such testimony was obvious error because the agent "made the generalization, albeit not quite directly, that drivers know they are carrying drugs." Id. at 878-79 & n. 12.

Nuckles' testimony that "[t]he people who are driving money or who are driving dope know they are transporting either dope or money, something of value," is indistinguishable from the testimony held erroneously admitted in Gutierrez-Farias and Ramirez-Velasquez. Id. at 879. Cuellar has thus established an error that is obvious, thereby satisfying the first two prongs of the plain error standard. However, Cuellar also bears "the burden of demonstrating that the error affected his substantial rights, i.e. affected the outcome of the proceedings." Id.

Cuellar cannot sustain that burden. As set forth above in the description of the evidence presented at trial, the jury heard ample evidence of Cuellar's guilty knowledge. Cuellar was carrying a large sum of cash on his person that smelled noticeably of marijuana. He was nervous when stopped by officers on the highway and made numerous inconsistent false and implausible statements about his travels. He attempted to focus

29

the officers' attention on the trunk of the car and away from the secret compartment where the money was hidden. Once he was arrested and brought in for further questioning he told officers that if he did not have the car in Acuna by midnight his family would be floating down the river. This evidence provided a firm basis for the jury to find that Cuellar knew he was transporting funds that represented the proceeds of illegal activity. Because Cuellar has not demonstrated that his substantial rights were affected by the admission of improper drug-courier profile testimony, he has not shown plain error. See Ramirez-Velasquez, 322 F.3d at 879.

IV.

For the foregoing reasons, Cuellar's conviction is affirmed. AFFIRMED.

JERRY E. SMITH, Circuit Judge, with whom DEMOSS, Circuit Judge, joins, dissenting:

This is a case of a prosecution run amok. Mike Nifong, another prosecutor apparently familiar with the "win at any cost" mantra,[1] most surely would approve. The government set out to "get" Humberto Cuellar for *something*, and why not? He is apparently a "bad dude," an accessory to what likely was a serious drug-running operation; moreover, this is, after all, the "war on drugs." But instead of charging under a statute of which Cuellar (by his attorney's admission) is guilty, the government used the wrong law, and the majority now has blessed the government's missteps with a holding that makes "money laundering" out of virtually any transfer of illicit proceeds across an international border. A person steals petty cash, hides it in his shoe, and is caught crossing into Mexico: "money laundering," according to the en banc majority's rendering of this appeal.

The government is guilty of at least three excesses in this case. First, it stumbled by charging the wrong statute, when it easily could have used the correct one. Then, in a transparent

---

[1] *See, e.g.,* Dorothy Rabinowitz, *The Michael Nifong Scandal*, WALL ST. J., Jan. 11, 2007, at A15, available at http://www.opinionjournal.com/medialog/?id=110009507; Editorial*, As Duke Case Unravels, Focus Turns to Prosecutor*, USA TODAY, Dec. 27, 2006, at A12, 2006 WLNR 22559516.

effort to cover for its blunder, it has succeeded in making a mockery of the concept of money laundering in this court. And finally, it blatantly deprived Cuellar of his rights at trial by its knowing failure to provide adequate disclosure of the expected testimony of a key, expert witness.

Today's zealous en banc majority aids and abets the government's excesses. It exhibits an impressive determination to aid the "war on drugs" and the government's boundless quest to incarcerate a foot soldier who apparently is on the wrong side of that war. Unfortunately, to achieve its end the majority ignores common sense, context, and accepted principles of statutory interpretation to reach an ultimately absurd and embarrassing re-sult. Because I decline to rewrite the law judicially, I respectfully dissent.

I.

The relevant statute, 18 U.S.C. § 1956, bans, *inter alia*, a transportation of money that a defendant knows is designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(B)(1). The majority finds that because Cuellar temporarily hid the money to transport it,

his behavior is within the plain meaning of the words "conceal" and "location."

If "conceal" and "location" are considered in isolation, the majority's reading might be plausible. But these terms are not supposed to be considered in isolation, and we must follow the Supreme Court's guidance:

> The definition of words in isolation, however, is not necessarily controlling in statutory construction. A word in a statute may or may not extend to the outer limits of its definitional possibilities. Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of a statute, and consulting any precedents or authorities that inform the analysis.

*Dolan v. United States Postal Serv.*, 126 S. Ct. 1252, 1257 (2006).[2] The majority must rest its interpretation on the meaning of the words in isolation, because if the context and purpose of the statute are properly considered, the majority's interpretative error is quickly exposed.

At least two interpretations of these words are plainly apparent. There is a difference between concealing something to

---

[2] The *Dolan* Court found that, based on context and precedent, the term "negligent transmission" had a statutory meaning that was more narrow than its ordinary meaning and usage. The majority opinion was joined by Justice Scalia, one of the judiciary's foremost textualists. *See also United States v. Lowe*, 118 F.3d 399, 402 (5th Cir. 1997) ("[T]he plain meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." (citing *Reich v. Arcadian Corp.*, 110 F.3d 1192, 1195-96 (5th Cir. 1997))).

transport it, and transporting something to conceal it. Cuellar was unquestionably doing the former: He concealed money under the floorboards of his car to transport it. Without knowing his ultimate plans for disposing of the cash once he reached his destination, however, it is uncertain whether he was also doing the latter.

For example, if Cuellar intended to place the money in a safe deposit box in another's name, then he was transporting the money to conceal it. But if he intended to spend the money, deliver it to someone, or even donate it to charity, then he was merely concealing the money to transport it. The government did not prove or even attempt to prove anything about what Cuellar planned to do with the money once he reached his destination; the prosecution showed only that he was concealing the money to transport it.

The majority reasons that because "Congress chose the broad, unqualified word 'conceal,'" the statute prohibits both transporting money to conceal it and concealing it to transport it. The majority finds that "[i]t makes no sense to say that Congress only intended to prohibit concealment that is accomplished in a certain way." But later in the opinion the majority explicitly contradicts itself when it declares that the

statutory meaning of "conceal" does not include "minimal attempts at concealment," such as concealing money in a closed box.

This is a damaging admission, by the en banc majority, that these words cannot be interpreted in isolation. In isolation they could bear at least several meanings, from banning, as the text states, all concealment, to proscribing only those efforts at concealment that go beyond "minimal effort," to banning concealment that is indicative of the traditional understanding of money laundering. The majority uses the frailest of legal logic to claim that the second option is correct. An honest examination reveals how wrong that proffered logic really is.

### The statute's title

This statute's title is "[l]aundering of monetary instruments." Where, as here, a statutory phrase is susceptible to multiple interpretations, "the title of a statute or section can aid in resolving an ambiguity in the legislation's text."[3] When used in a monetary context, to launder is to disguise ille-

---

[3] *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991). *See also, e.g.*, *Carter v. United States*, 530 U.S. 255, 267 (2000); *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998); *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 388-89 (1959); *United States v. Katz*, 271 U.S. 354, 357 (1926); *Smythe v. Fiske*, 90 U.S. 374, 380 (1874); *Denn v. Reid*, 35 U.S. 524, 527 (1836).

gally-obtained money by making it appear legitimate.[4]  This usage of the word is well accepted and has existed for over thirty-five years.[5]

The statute's title cuts against the majority's interpretation.  Of the two interpretative possibilities——concealing money to transport it and transporting money to conceal its location——the latter is consistent with the definition of money laundering, which is to make dirty money difficult to trace by concealing its  illegality.

---

[4] *See, e.g.*, PRESIDENT'S COMM'N ON ORGANIZED CRIME, THE CASH CONNECTION: ORGANIZED CRIME, FINANCIAL INSTITUTIONS, AND MONEY LAUNDERING 7 (Books for Bus. 2001) (1985) (defining money laundering as "[t]he process by which one conceals the existence, illegal source, or illegal application of income, and then disguises that income to make it appear legitimate"); BLACK'S LAW DICTIONARY 1027 (8th ed. 2004) (stating that money laundering is "the act of transferring illegally obtained money through legitimate people or accounts so that its original source cannot be traced"); 8 OXFORD ENGLISH DICTIONARY 702 (2d ed. 1989) (explaining that to launder is "to transfer funds of dubious or illegal origin, usually to a foreign country, and then later to recover them from what seem to be 'clean' sources"); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 992 (4th ed. Houghton Mifflin Co. 2006) (showing that to launder is "to disguise the source or nature of (illegal funds, for example) by channeling through an intermediate agent"); THE NEW OXFORD AMERICAN DICTIONARY 958 (2d ed. Oxford Univ. Press 2005) (stating that to launder is to "conceal the origins of (money obtained illegally) by transfers involving foreign banks or legitimate businesses").

[5] THE BARNHARD DICTIONARY OF ETYMOLOGY 581 (Robert K. Barnhard ed., H.W. Wilson Co. 1988) ("The modern meaning of launder, as used to denote the 'cleansing' of illegally obtained 'dirty' money to make it appear 'legitimate, lawfully gained, or acceptable,' originated in 1970.").

*Legislative history*

The terms of a criminal statute are to be construed according to their "ordinary and natural meaning . . . as well as the overall policies and objectives of the statute." *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004) (quoting *United States v. Lowe*, 118 F.3d 399, 402 (5th Cir.1997)). If the language can bear more than one meaning, courts can use legislative history as an interpretive aid. *Id.* at 743.

When viewed in its totality, this statute is designed to combat money laundering, which is the cleansing of illegal funds, and not to curb the mere transportation of concealed cash. This is reinforced, as I have said, by the statute's title. The multiple possible interpretations warrant, however, an examination of legislative history.

This inquiry is fraught with peril, because it is seductively easy to find a small, but misrepresentative, piece of legislative history that appears to support a given position.[6] Caution is thus required.[7] But even when viewed with great care,

---

[6] As Judge Leventhal warned, using legislative history is sometimes akin to "looking over a crowd and picking out your friends." *See* Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 IOWA L. REV. 195, 214 (1983).

[7] *See Aviall Servs., Inc. v. Cooper Indus., Inc.*, 312 F.3d 677, 683-84 (5th Cir. 2002) (citing *Boureslan v. Aramco*, 857 F.2d 1014, 1018 (5th Cir. 1988), *adopted en banc*, 892 F.2d 1271 (5th (continued...)

the legislative history makes it obvious that Congress passed this statute to combat traditional money laundering. Absent is any support whatsoever for the majority's interpretation.

The government's response to money laundering activity began with the passage of the Bank Secrecy Act in 1970.[8] That law, however, did not reach much of the money laundering that was occurring. Thus, in 1984 the President's Commission on Organized Crime released a report detailing the problem presented by money laundering and recommending the legislative solution that eventually became the law at issue in this case, § 1956.

The executive report defines money laundering as "the process by which one conceals the existence, illegal source, or illegal application of income, and then disguises that income to make it appear legitimate." PRESIDENT'S COMM'N, *supra*, at 7. The term is "derived from the argot of criminals, who refer to 'dirty' or 'black' cash being 'washed' so that it can be used openly." *Id.* at 84 n.4. The report provided several examples of the money laundering behavior that should be targeted by legislation: payments to the Gambino family that were transferred through three bank accounts, including one in Switzerland, then

---

[7](...continued)
Cir. 1990), *aff'd sub nom. EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991)).

[8] *See* Pub. L. 91-508, 84 Stat. 1118, § 221(a)(2), as amended, 31 U.S.C. § 5313(a).

withdrawn and placed into a safe deposit box; secretion into Swiss bank accounts, by the head of the New Orleans family of La Cosa Nostra, of $1.8 million that had been extorted from the Teamsters; a drug trafficker's practice of making numerous small deposits, totaling over $500,000, into a casino account, gambling a small amount, and then withdrawing the balance from the account in the form of checks made out to third parties, which were deposited in a securities firm before withdrawal; and the Hell's Angels' use of drug proceeds to purchase, through front men, failing businesses and real estate to legitimize the cash. *Id.* at 10-11. Each of these examples is consistent with a legislative desire to combat not the mere transportation of hidden cash, but the cleansing of illegitimate cash to make it appear legitimate.

The same intent is apparent in the legislative history once Congress began, based on the President's recommendations, to craft the money laundering bill. The committee report states that Congress aimed the legislation at "complex schemes to disguise the illegal nature and true source" of the proceeds of their illegal activity. *United States v. Butler*, 211 F.3d 826, 829 (4th Cir. 2000) (quoting S. REP. No. 99-433, at 2 (1986)). Many of our sister circuits agree; as one summarized, "The legislative history indicates that Congress passed the money

laundering statutes to criminalize the means criminals use *to cleanse their ill-gotten gains*."[9]

This intent is also plainly evinced by the floor statements of the bill's sponsors. Senator Thurmond, then Chairman of the Judiciary Committee, said that "[c]reation of a money laundering offense is imperative if our law enforcement agencies are to be effective against the organized criminal groups which reap profits from unlawful activity by camouflaging the proceeds through elaborate laundering schemes." *See* 132 CONG. REC. 17,571 (1986). Senator Biden remarked that "[m]oney laundering is the process by which the proceeds of crime are disguised to appear legitimate . . . . Or as a former money launderer stated, 'Laundering money is to switch the black money or the dirty money to clean money.'" *Id.* Senator DeConcini declared that "[w]ithout the means to launder money, thereby making cash generated by a criminal enterprise appear to come from a

---

[9] *United States v. Savage*, 67 F.3d 1435, 1441 (9th Cir. 1995) (emphasis added). *See also United States v. Edgmon*, 952 F.2d 1206, 1213 (10th Cir. 1991) (citing S. REP. NO. 99-433, at 4); *United States v. Estacio*, 64 F.3d 477, 481 (9th Cir. 1995) ("The senate report on § 1956 expresses the need for a federal criminal offense aimed directly at the activity of laundering the money gained from illegal activity."); *United States v. Holmes*, 44 F.3d 1150, 1154 (2d Cir. 1995) ("Creation of a money laundering offense is imperative if our law enforcement agencies are to be effective against the organized criminal groups which reap profits from unlawful activity by camouflaging the proceeds through elaborate laundering schemes.") (quoting S. REP. NO. 99-433, at 9).

legitimate source, organized crime could not flourish as it now does." *Id.* at 18,487. Finally, Senator Hatch defined the target of the bill as "the process by which one conceals the existence, illegal source, or illegal application of income and camouflages the source of that income to make it appear legitimate." *Id.*

The final piece of legislative history evincing the intent of Congress can be found by examining a subsequent law, 31 U.S.C. § 5332, which prohibits bulk cash smuggling. *See* Pub. L. No. 107-56, § 371(c), 115 Stat. 337 (2001). It was enacted in 2001 because Congress realized that § 1956 did not prohibit the carrying of bulk cash across a U.S. border.[10] Or, as the Committee put it, "under current law, the person transporting currency may not be guilty of any money laundering offense." See H.R. REP. 107-250(i), at 37. The law was passed with a finding that "[t]he arrest and prosecution of bulk cash smugglers are important parts of law enforcement's effort to stop the laundering of criminal proceeds, but the couriers who attempt to smuggle the cash out of the United States are typically low-level employees of large criminal organizations . . . ." Pub. L. No.

---

[10] The astute reader may ask why Cuellar was not convicted under this statute. It is because the government did not charge him with it, but opted instead to charge money laundering, which carries a maximum prison term of twenty years, compared to a maximum of five for bulk cash smuggling. *Cuellar concedes on appeal that he violated § 5332.*

-41-

107-56 § 371(a)(5). The conclusion is inescapable§§Congress enacted § 5332 because bulk cash smuggling by low-level drug couriers is not proscribed by § 1956.

Thus, the history underlying the enactment of § 5332 is especially damning to the position taken today by the en banc majority. Congress would not have passed a statute banning bulk cash smuggling by low-level drug couriers if such behavior was already prohibited as money laundering. Maybe because it would doom its desired conclusion, the majority conveniently opts not to address this issue. It ignores all the legislative history, hiding instead behind the facade that the plain language of the statute compels its conclusion.

Further, none of the pitfalls that occasionally plague an inquiry into legislative history is present here. It is overwhelmingly evident from the executive report, committee reports, sponsor statements, and subsequent legislation that Congress intended the money laundering statutes to target the cleansing of illegally obtained money. In support of the en banc majority's novel interpretation, however, the government can muster only one snippet of legislative history from § 1956§§a single sentence from a floor statement that, when considered fairly and in context, actually cuts *against* the majority's

interpretation.[11]  In contrast, Cuellar cites thirty-eight pieces of legislative history in consistent support of the correct interpretation.

## *The rule of lenity*

The rule of lenity is nearly as old as statutory interpretation itself.  *See United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 79 (1820).  That rule dictates that ambiguous statutory language in criminal statutes should be strictly construed to ensure that we do not penalize conduct that Congress did not intend to criminalize.  *See, e.g., United States v. Elrawy*, 448 F.3d 309, 316 (5th Cir. 2006).  It is an "outgrowth of our reluctance to increase or multiply punishments absent a clear and definite legislative directive."  *Id.* (quoting *Simpson v. United States*, 435 U.S. 6, 15-16 (1978)).  The rule of lenity is triggered if the interpretive issue is subject to "some doubt," and the doubt must be "resolved in favor of the defendant."  *Adamo Wrecking Co. v. United States*, 434 U.S. 275,

---

[11] The majority cites a statement from Senator Biden that money laundering is used by drug traffickers to convert illegal cash into manageable form.  This quote came two sentences after Senator Biden had defined money laundering as "the process by which the proceeds of crime are disguised to appear legitimate."  132 CONG. REC. 17,571 (1986).

284-85 (1978) (citing *United States v. Bass*, 404 U.S. 336, 348 (1971)).

The rule of lenity cuts against the majority's interpretation. The majority resolves the statute's ambiguity in a manner that exposes Cuellar to a punishment of twenty years' imprisonment and a fine of up to $500,000. A strict construction of the statute, as required by the rule of lenity, would find that conviction requires proof that the money is being transported to conceal its location, a burden the government utterly failed to meet.

## *The Canon Against Absurdities*

It is well established that reviewing courts must avoid interpretations that produce absurd results.[12] This maxim also dictates that if a statute's language appears plain but leads to absurd results, the court should examine extrinsic interpretive aids.[13]

---

[12] *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 200 (1993); *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 108, 120 (1988); *Carpenters Dist. Council v. Dillard Dep't Stores*, 15 F.3d 1275, 1285 (5th Cir. 1994) (citing *Birdwell v. Skeen*, 983 F.2d 1332, 1337 (5th Cir. 1993)).

[13] *Clinton v. City of New York*, 524 U.S. 417, 429 (1998); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994); *Burns v. United States*, 501 U.S. 129, 135 (1991); *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454-55 (1989); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 509 (1989); *Am. Trucking Ass'ns*,

(continued...)

Two examples illustrate the absurdity of the majority's interpretation. First, imagine a young petty thief who pickpockets a small sum of cash from an unsuspecting Laredo tourist and intends to spend it on an enjoyable evening at the bars of Nuevo Laredo, just across the Mexican border. Wanting to escape suspicion at the border, the youth conceals the cash in his shoe. But alas, his nervous demeanor prompts border agents to question him further, and he reveals his crime. Under today's holding, this minor miscreant is now guilty of money laundering and faces up to 20 years' imprisonment and a fine of $500,000.

Our hypothetical international money-laundering youth satisfies all five prongs of the statute: (1) He attempted to transport funds across a U.S. border; (2) the funds were the proceeds of illegal activity; (3) he knew the funds were illegal; (4) the method of transportation was designed to conceal the location of the funds by hiding it from law enforcement; and (5) the accused knew that the concealment was part of the transportation plan. The fourth prong is satisfied because, under today's en banc decision, the concealment prong of the money laundering statute requires only that a defendant temporarily hide money for the purpose of transporting it. This

[13](...continued)
*Inc. v. ICC*, 659 F.2d 452, 459 (Former 5th Cir. Oct. 1981) (citing *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543-44 (1940)).

is because, as the majority lamely explains, "Congress chose the broad, unqualified word 'conceal.' It makes no sense to say that Congress only intended to prohibit concealment that is accomplished in a certain way."

This is an embarrassing and absurd result and thus cannot be the correct meaning of the statute, yet it is the conclusion of today's majority and is now the law in this circuit. At oral argument the government claimed that the hypothetical pickpocket would not be guilty of money laundering because hiding money in one's shoe is not concealment, but instead is only "mere concealment," whereas hiding money in a hidden compartment covered with goat hair is concealment. When pressed, the government attorney stated, "I don't think that just concealing money is what Congress was talking about."

Today's majority makes a similarly irrational distinctionSSbetween concealment and "mere concealment"SSwhen it distinguishes *United States v. Dimeck*, 24 F.3d 1239 (10th Cir. 1994). In that case the defendant hid cash in a box. The majority claims this was insufficient to satisfy the concealment prong of the statute, because it was "a minimal attempt at concealment."

Here the majority's zealous reasoning completely unravels. Its argument is purportedly premised on the plain words of the

statute, so it refuses to consider the interpretive tools used above, because it maintains that the text is not susceptible to multiple interpretations:  The majority reasons that "to conceal" is to hide something,[14] and Cuellar hid money while he was transporting it, so his transportation was designed to conceal and satisfies the statute.

But, when confronted with *Dimeck*, or presumably with the hypothetical above, the majority says that it is only a "minimal attempt" at concealment, or as the government says, "mere concealment" or "normal concelament," and accordingly is not concealment under the statute.  Thus, the majority goes beyond the plain meaning and finds that when Congress said "conceal," it actually meant "tried really hard to conceal" or "concealed really well."  This majority, as only a majority can, is having its cake and eating it too:  It refuses to examine tools of statutory interpretation on the excuse that it must stop at the plain meaning, but it distinguishes unfavorable precedents and hypotheticals by going *beyond* the plain meaning.

---

[14] Conceal means "to put, remove, or keep out of sight or notice; to hide."  3 OXFORD ENGLISH DICTIONARY 646 (2d ed. 1989). *See also* WEBSTER'S NEW INTERNATIONAL DICTIONARY 551 (2d ed. 1958)("To hide or withdraw from observation; to cover or keep from sight; to prevent the discovery of"); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 271 (1984)("to prevent disclosure or recognition of; to place out of sight").

The absurdity of the result reached by the majority is starkly illustrated by still another hypothetical. Cuellar would not be found guilty of violating this statute under today's ruling if he had set the cash, bundled and smelling of marihuana, in a large pile in the passenger seat of his car. Under such a circumstance, he would have made no attempt to hide the money, so his behavior would fall outside the reach of the majority's ruling. One lesson pickpockets and petty criminals near a U.S. border should take from today's ruling is to carry the proceeds of their illegal activity openly and conspicuously when crossing the border, because if they hide the money they place themselves at risk of a conviction for money laundering, with its stiffer penalties. Although that might be a rational legislative goal, it is not encompassed within a fair reading of § 1956.

The majority does not even pretend that Congress could have intended these results. In fact, the majority does not address these hypotheticals or any other consequences of its ruling. In-stead, its *ipse dixit* opinion focuses exclusively on ensuring that Cuellar's conviction is upheld by any means acceptable to a majority of the en banc judges.

The cases cited by the majority, when reviewed carefully, provide no support for its view. The majority leads with *United States v. Ness*, 466 F.3d 79 (2d Cir. 2006), in which the defendant moved narcotics proceeds abroad at the behest of drug traffickers. He transferred millions of dollars in cash from the United States to Belgium, Canada, and Israel by employing a sophisticated network of couriers who used code words and clandestine meetings to smuggle the funds. *United States v. Ness*, 2003 WL 21804973, at *1-*4 (S.D.N.Y. Aug. 6, 2003). *Ness* does not, as the majority claims, indicate that the position of the Second Circuit aligns with the position the majority adopts today. The *Ness* court explicitly premises its holding on the complexity of the scheme: "[W]e express no view as to sufficiency issues that might arise when the remittance of unlawful funds is surrounded by less elaborate stratagems or a lesser measure of secrecy." *Ness*, 466 F.3d at 81. The scrupulous avoidance of a paper trail and the use of numerous couriers, small bills, clandestine meetings to funnel millions of dollars in drug proceeds overseas is classic money laundering, and it could not be more distinguishable from Cuellar's use of duct tape and goat hair to conceal money temporarily while he transported it. The majority next relies on *United States v.*

*Short*, 181 F.3d 620 (5th Cir. 1999) (Davis, J.), in which defendant was convicted of money laundering because he gave his wife $25,000 and asked her to place it in a safe deposit box rented in the name of one of her relatives. The majority claims that "nothing happened to the cash except the defendant removed it from his possession and tried to hide it." The majority errs: Something did happen to the cash§§Short passed it to someone else with directions to place it in a secure location under the name of an innocent relative. This is classic money laundering§§the transfer of dirty money through legitimate individuals to disguise its criminal source.

This court did not hold in *Short*, as today's majority appears to claim, that Short's conduct was sufficient to justify the conviction merely because he tried to hide the cash. Rather, the panel based its holding on the manner by which Short did so, particularly his planned transfer of the cash through others. The court held that the conviction was justified because "Short was attempting to conceal or disguise [the cash] by having his wife place the money in a safety deposit box under the name of one of her relatives." *Id.* at 626. By placing the money under the name of someone not connected directly to Short, but only to his wife, he was trying to make the cash appear legitimate.

-50-

In contrast to Short, Cuellar merely hid cash to transport it. He did not attempt to conceal the fact that the cash was drug money; to the contrary, as Agent Nuckles testified, Cuellar's transportation method typified that of a drug courier. Nor did Cuellar attempt to transfer the cash through legitimate persons, as did Short, to make it appear legal. These distinctions place Cuellar's conduct outside the holding of *Short*, under which the evidence against Cuellar is insufficient to sustain a conviction *under the statute the government charged*.

The majority next cites *United States v. Cihak*, 137 F.3d 252 (5th Cir. 1998), which is just as distinguishable. Cihak received approximately $2 million in illegal kickbacks funneled through his attorney in an elaborate eight-step scheme to mask the nature and source of the funds.[15] Following a codefendant's

---

[15] The opinion described the laundering scheme by which defendant Bloch would provide kickbacks to Cihak:

(1) First City paid Banner [Bloch's company] for Bloch's consulting services; (2) Bloch deposited the checks from First City into Banner's account; (3) the funds were then wired to another Banner account; (4) from this account, Bloch drew checks payable to himself; (5) these checks were deposited into his personal account; (6) checks made payable to Landan [Cihak's attorney] were then drawn on this account; (7) these checks were deposited into Landan's firm's account; (8) from this account, Landan issued checks payable to various banks as payment on Cihak's outstanding debts and to make investments for Cihak.

(continued...)

conviction, Cihak transferred $860,000 to multiple foreign accounts in different countries. *Id.* at 262. The money was first transferred to two accounts in Texas before being sent to accounts in Panama and Mexico. *Id.* As was the case in *Ness* and *Short*, this is classic money laundering: The defendant split his illegally gained money into smaller amounts, transferred these amounts multiple times through different banks, and ultimately placed them into offshore accounts. It is amazing that the majority finds this precedent, involving sophisticated white-collar money laundering, applicable to Cuellar's use of duct tape and goat hair to hide money covered in marihuana. It should be obvious that Cihak's behavior typified money laundering, as targeted by § 1956, and that Cuellar's did not.

The only other published case cited by the majority is *United States v. Carr*, 25 F.3d 1194 (3d Cir. 1994), in which defendant made numerous trips to the Cayman Islands and Colombia to deposit quantities of bills of small denominations that had been exchanged for large quantities of fresh $100 bills. *Id.* at 1199-1200. Once again, note the facts omitted by the majority, which show that Carr was participating in classic money

---

[15](...continued)
*Cihak*, 137 F.3d at 257.

laundering: the exchange of large bills for smaller ones and the making of multiple cash deposits into offshore banks accounts.

The majority repeats the same drill four timesŞŞit cites cases, carefully removes all context, and ignores the inconvenient details that distinguish those cases from Cuellar's conduct. All four decisions stand squarely for the proposition that § 1956 bans only the transportation of money to conceal it, not the concealment of money to transport it. Further, in citing only these four inapposite decisions, the majority ignores the overwhelming caselaw, in both this court and our sister circuits, to the effect that the statute requires a design to create the appearance of legitimate wealth.[16] It is astounding that the

_____

[16] *See, e.g. United States v. Dobbs*, 63 F.3d 391, 397 (5th Cir. 1992) ("It is necessary to show a desire to create the appearance of legitimate wealth or otherwise to conceal the nature of funds so that it might enter the economy as legitimate funds."); *United States v. Gonzalez-Rodriguez,* 966 F.2d 918, 925 (5th Cir. 1992); *United States v. Powers*, 168 F.3d 741, 748 (5th Cir. 1999) ("Under the money laundering statute, the government must . . . show that the defendant desired to create the appearance of legitimate wealth or otherwise to conceal the nature of funds so that the money could enter the economy as legitimate funds."); *United States v. Olaniyi-Oke,* 199 F.3d 767, 771 (5th Cir. 1999) ("In one sense, the acquisition of any asset with the proceeds of illegal activity conceals those proceeds by converting them into a different and more legitimate-appearing form. But the requirement that the transaction be designed to conceal implies that more than this trivial motivation to conceal must be proved."); *Dimeck*, 24 F.3d at 1246; *United States v. Garcia-Emanuel,* 14 F.3d 1469, 1474-1477 (10th Cir. 1994) ("[C]ases involving investments made with illegal proceeds are close to the core of the statute's purpose of criminalizing changing cash into an ostensibly legitimate form,

(continued...)

majority rewrites the law in this circuit, and creates a circuit

split, in such a cavalier and intellectually imprecise manner.

Finally, in addition to arguing that Cuellar concealed the

money, the majority holds that the evidence can bear a jury find-

ing that Cuellar's transportation method concealed the "nature of

the cash as drug proceeds." But Cuellar did precisely the oppo-

site: He transported the cash in a manner that made it obvious

that this was drug money; the sum of $83,000 in cash smelling of

marihuana was bundled, wrapped in duct tape, and covered with

---

[16](...continued)
such as business profits or loans, before using those funds for personal benefit.") (internal quotations and citations omitted); *United States v. Sanders*, 929 F.2d 1466, 1472 (10th Cir. 1991); *United States v. Stephenson*, 183 F.3d 110, 121 (2d Cir. 1999) ("There is no indication, therefore, that the drug proceeds were spent to create the appearance of legitimate wealth . . . .") (internal quotations and citations omitted); *United States v. Samour*, 9 F.3d 531, 535 (6th Cir. 1993); United States v. Esterman, 324 F.3d 565, 570 (7th Cir. 2003) ("[T]he Money Laundering Control Act of 1986 was meant to target the transformation of funds derived from illegal activities into a "clean" or useable form."); *United States v. Jackson*, 935 F.2d 831, 841-42 (7th Cir. 1991); *United States v. Wynn*, 61 F.3d 921, 926 (D.C. Cir. 1995) (upholding a money laundering conviction because, *inter alia*, "the jury reasonably could have inferred that Wynn knew that their money was dirty and that he knew that the two were anxious to disguise their identity as the purchasers of the merchandise and the source of the cash used to pay for it."); *United States v. Johnson*, 440 F.3d 1286, 1291 (11th Cir. 2006) ("Merely engaging in a transaction with money whose nature has been concealed through other means is not in itself a crime . . . . If transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute." (quoting *United States v. Majors*, 196 F.3d 1206, 1213 (11th Cir. 1999))).

plastic bags, then placed in a hidden compartment and covered with carpet and goat hair. These measures would not persuade anyone that this cash was legitimate.

Quite the oppositeSSit is difficult to imagine what more could be done to indicate that this cash was illicit. In addition to comporting with common sense, this conclusion is verified by Agent Nuckles's testimony that this was a "usual method" of transporting drug money. The majority is incorrect: This method of transportation made it abundantly obvious that the cash was drug money.

In sum, the majority finds a way to ensure that Cuellar goes to prison, thereby protecting the Executive Branch's prosecution despite its having charged entirely the wrong statute. Unfortunately, that now-successful effort requires ignoring the statute's context, its title, the legislative history, the rule of lenity, the canon against absurdities, and existing caselaw. I can find no basis for the majority's holding other than the personal legislative preferences of its members.


II.

The majority also holds that the district court acted permissibly in not imposing sanctions on the government for violating Federal Rule of Criminal Procedure 16. This is error.

A.

As it does with accepted principles of statutory interpretation, the en banc majority completely ignores the framework used by this court in evaluating whether to impose sanctions for a violation of rule 16. In *United States v. Sarcinelli*, 667 F.2d 5, 6-7 (5th Cir. Unit B 1982), we articulated a four-factor test to determine a proper sanction: (1) the reasons why disclosure was not made; (2) the amount of prejudice to the opposing party; (3) the feasibility of curing such prejudice with a continuance of the trial; and (4) any other relevant circumstances.[17]

A brief recounting of facts omitted by the majority is needed before embarking on the analysis. Cuellar requested a summary of the government's expert witnesses that described the "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." FED. R. CRIM. P. 16(a)(1)(G). The court's discovery order required a response by a specified date. Almost three weeks after that deadline, and only two weeks before trial, the government stated, in a letter, that Nuckles would testify

---

[17] *See also United States v. Katz*, 178 F.3d 368, 371 (5th Cir. 1999) (citing *United States v. Bentley*, 875 F.2d 1114, 1118 (5th Cir. 1989)).

concerning the organizational structure of a typical drug smuggling operation, including, but not limited to, how drug proceeds are packaged, hidden and transported; routes of travel; time of day; types and conditions of vehicles; documents kept by transporters in their vehicles or on their persons; manner in which drugs are smuggled into the United States and money is smuggled out of the United States; and any other testimony that may help the jury understand this case.

The government provided no further details on the specifics of the testimony or on Nuckles's qualifications until it gave Cuellar a handwritten note in response to his motion to deny the expert testimony. The note, in its entirety, read, "Rick Nuckles = 12 years U.S. Customs; 4 years DEA; 7 years state + local, UC w/ DEA, 100's of drug cases investigated in all capacities." The court denied Cuellar's motion, noting its familiarity with Nuckles based on its admission of him as an expert on at least one occasion.

Instead of using the *Sarcinelli* framework, which it mentions in a footnote, the en banc majority creates a new test. It first finds that the government did violate rule 16, then it notes that "[t]he type of expert testimony offered by Officer Nuckles has become almost routine."[18] Finally comes the new test: The refusal to impose sanctions on the government was not improper after all, according to the majority's notion, because Cuellar

---

[18] This section conveniently omits any discussion of the majority's later finding that Nuckles's drug courier profiling testimony was improper and should have been excluded.

effectively cross-examined Nuckles, so Cuellar's substantial rights were not prejudiced.

The two cases cited by the majority for its new test provide no support. In *United States v. Doucette*, 979 F.2d 1042 (5th Cir. 1992), the disputed evidence was made available to defendant well before trial, and defense counsel did not avail himself of the opportunity to review it. "For this reason, there can be no violation of Rule 16 where, as here, the defendant's lack of diligence is the sole cause of his failure to obtain evidence made available by the government." *Id.* at 1045. This holding has no bearing on the present case, where the government, in blatant and intentional violation of rule 16, provided no timely opportunity for Cuellar to review fully the expected testimony of Nuckles.

The other cited authority is *United States v. Smith*, 354 F.3d 390 (5th Cir. 2003), which dealt with whether one sentence of the expert's testimony was beyond his expertise and exceeded the disclosure that was made in accordance with rule 16. This is plainly much different from the case before us, where (as the en banc majority admits) the government has violated rule 16.

*Doucette* and *Smith* thus do not form a reasonable basis for the majority's new test. Today's majority opinion creates one "super factor" that supplants the entire *Sarcinelli* framework:

If the defendant effectively cross-examines an expert witness, any violation of rule 16 by the government in failing to disclose that witness's testimony is overlooked.

I wonder whether the majority has considered the risky game today's opinion creates for criminal defendants when the government violates rule 16. Defendants whose counsel "burn the midnight oil" to cobble together a cross-examination strategy that, while less effective than one that could have been prepared had the government followed rule 16, still manages to be semi-effective, now face the prospect of losing the remedy for the rule 16 violation. On the other hand, the defendant whose attorney does nothing and mounts an ineffective cross-examination risks harming his chances at trial but stands a better chance of an appellate court's finding that a remedy is needed for the rule 16 violation. These perverse incentives provide further reason for this court to hew to the *Sarcinelli* test.

Had the court applied *Sarcinelli*, and had it done so properly, it would have found the following: Under the first factor, the government makes no attempt to explain its failure to adhere to the discovery order. Under the second, Cuellar was caused substantial prejudice by the government's three-week head start in the preparation of Nuckles, while Cuellar had two weeks to prepare and little detail about the content of Nuckles's

testimony.  Third, the district court likely could have cured the prejudice by granting, as Cuellar requested, a continuance so he could prepare more fully.

Finally, other factors may come into play.  It is here that the majority should have considered the factor it has chosen to make dispositive, that despite the violation of rule 16, Cuellar elicited (the seemingly self-evident) testimony from Nuckles that some "legal enterprises could have a need to transport United States currency to Mexico."  This is less than eviscerating cross-examination testimony, but according to today's majority, it is sufficient to excuse the government's rule 16 violation.

In sum, the government completely flouted the discovery rules to Cuellar's detriment but offered no explanation for its action.  The majority finds that, because Cuellar elicited self-evident testimony on cross-examination, he had sufficient time to prepare, so  no sanction is necessary.  This holding creates perverse incentives: incentives for the government to ignore well-established discovery rules because it need not fear sanctions, and incentives for the defendant to hold back from mounting an effective defense so he might have a chance to have the government sanctioned on appeal.

## III.

In summary, Humberto Cuellar likely committed a serious violation of the United States Code, but not of the section of which he was convicted. Justice requires that he be tried for a crime of which a reasonable prosecutor can believe he is actually guilty. The war on drugs is not an excuse to violate the norms of fair play and evenhandedness. I call upon the Attorney General to confess error in this case of prosecutorial excess, and I respectfully dissent from the majority's blessing of the government's failure to do justice in this case.

JAMES L. DENNIS, Circuit Judge, dissenting:


I respectfully dissent from the majority opinion for the reasons assigned in parts I through III of Judge Smith's dissenting opinion.